**IN THE COURT OF APPEALS OF IOWA**

No. 14-1112
Filed August 19, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KENNETH OSBORNE ARY,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Rebecca Goodgame

Ebinger (pretrial) and Lawrence P. McLellan (trial), Judges.


        A defendant challenges his drug delivery convictions based on alleged

error in the jury selection process. **REVERSED AND REMANDED.**


        Patrick W. O'Bryan of O'Bryan Law Firm, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, Kevin Cmelik and Kelli Huser,

Assistant Attorneys General, John P. Sarcone, County Attorney, and Dan Voogt,

Assistant County Attorney, for appellee.


        Heard by Tabor, P.J., McDonald, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**TABOR, P.J.**

Voir dire "is the method to smoke out actual juror bias."[1] In this case, smoking out bias turned into fanning the flames. Sparked by the prosecutor's repeated inquiries during voir dire, a potential juror's extensive, expert-like statements regarding the dishonesty of people accused of drug dealing tainted the entire jury panel, requiring us to remand for a new trial.

## I.     Background Facts and Proceedings

The prosecution charged Kenneth Ary with three class "C" felonies for delivery of a controlled substance, crack cocaine, in violation of Iowa Code section 124.401(1)(c)(3) (2013). Each count related to a controlled drug buy completed by a confidential informant on three different days in the fall of 2013. After each completed buy, the informant turned over crack cocaine to the surveilling police officers, confirming he purchased the drugs from Ary.

The State's minutes of evidence attached to the trial information listed the informant and several police officers as witnesses. Because the defense discovery request was untimely and did not cite good cause, the district court denied Ary's opportunity to depose any of the State's witness.

Ary's trial began with jury selection on June 2, 2014—which turned out to be a busy day at the Polk County courthouse. Several jury trials were starting that morning with hundreds of potential jurors waiting to see whether they would be selected to serve.

---

[1] *State v. Webster*, ___ N.W.2d ___, ___, 2015 WL 3814823 at *11 (Iowa 2015).

In Ary's case, the prosecutor started off questioning the prospective jurors about their experiences in determining credibility, asking: "Have you ever been in a position where someone has told you something and you had to decide whether you believe them or not?" The prosecutor noticed panel member J.W. raise his hand and called on him. J.W. immediately offered the following information about himself:

> I'm a pastor, and I've dealt with all kind of things with that. And you know that they've done something and you—they're pretty good at spinning the truth, so to speak, you know. So I've dealt with a lot with people who, you know—you get a lot of people that come to your church and they're hurting, you know, and they have issues, whether it be with alcohol, drinking and getting in trouble driving or drugs and are selling drugs. I've dealt with that. Had a lot of people that I've dealt with that have gone to jail. I've got people that have been accused of stealing even to an amount of felony and somehow they spun their way out of it.

The pastor continued:

> I told her [referring to fellow juror J.K.] before I came in here I didn't know what the case was but I said, if it's involving drugs, I'd probably think the person is guilty and that's only because of my personal experience because I realize that a person has a right to defend themselves and go through the process, but I think I'm fairly prejudiced on this, any kind of a drug case with all of my experiences because even people that I know come from good families, they try to pretend they're innocent. I know the inside story, and I know they're not. So when it comes to this type of thing with Des Moines Police who arrest the person on drug charges, it appears there's guilt.

Another potential juror, A.H., responded that she had "the exact opposite prejudice" and believed most drugs should not be illegal. But the prosecutor brought the conversation back to J.W., saying: "[W]hat I want to talk to you about is, when you reach that conclusion in your own mind that this person has done

something or they haven't, they're telling you the truth or they're not, how do you do that?"

The pastor then shared an anecdote about a young person in his congregation that he suspected of stealing money and soda pop, "so I had to set him up." The pastor explained:

> [Y]ou're supposed to drop a buck in the refrigerator can and take the bottle. So this kid would come by and he would, you know, come out with the pop, and, you know, we kind of watched and we started noticing, we don't think he's paying for this. In fact, we think he's taking money out of the can. So we marked the—We took the serial numbers off of a $5 bill before that afternoon when he got out of school, and this is right on his route home. So we dropped it in the can. So when he went in there, we went in behind him and, sure enough, the suspicion was true.

J.W. said the boy stole from families in the church "and denied it every time. He always spun it. And then he got down to where he took $1300 and he admitted it, went to court, got a little slap, nothing."

The pastor used this experience to illustrate his own ability to read people:

> [W]hen you work with people a lot, you can detect what's going on. . . . I'm prejudiced because I have never pastored a person that was accused of any type of drug possession, usage or delivery or selling that I didn't know that they were guilty, and I found out and knew they were guilty because I know the people that know them and know that they went—they spun their story. They got out of court. They didn't go to prison. They came back another time, spun out, didn't go to prison, and then finally, they ended up in jail and they served two terms or probably 20 some years, you know, because it got worse and got worse and got worse.

The pastor continued, uninterrupted:

> So I'm just telling you up front that I am—While I want to believe a person is innocent until proven guilty, I on the other hand don't think that drugs should be legalized because it destroys people. It's so addictive and it ruins their lives, so—and I've worked

with too many people every day, day in, day out, so—I pastor over 5000 people, have a staff of ten pastors.

J.W. said while they were waiting for voir dire to begin, he told fellow juror J.K. he hoped he would not be hearing a drug case because of his negative attitude toward those accused of drug dealing. "But it's not because I'm just a jerk. But it's because of my experiences. I'm sorry. It's just—if there's a smoking gun, then there's a problem there."

The prosecutor assured J.W. "there's nothing to be sorry about that." And the prosecutor again asked J.W. how he came to his decisions about credibility: "[O]ne of the things that you told us was you may know the person or you may know people who know that person, or in the situation with the pop money, there were other facts that you believed that helped you confirm your suspicion. Is that right?" J.W. responded: "Right."

A.H. then expressed her concern that deciding this case would "go against [her] conscience." The prosecutor described her inclination to follow her personal opinion as jury nullification. The prosecutor said: "Jury nullification involves jurors who believe because they're jurors they can disregard facts; they can disregard what the law is and just do whatever you want because you're a juror. That's not how we do it here." The prosecutor then asked if anybody felt they would handle the case that way?

It was again J.W. who responded:

> I'm not sure I understand your question. . . . If you're asking the question whether or not I think that I could be impartial . . . I do not think I can, I mean, honestly. And that's to be fair to the gentleman being accused in the sense that, you know, I'm going to have a very difficult time with that.

The pastor shared his view with the rest of the panel, as follows: "I'm 61. I've been in this thing for 40 years, and I've worked with lots and lots of people, and I've never known a case where someone was falsely accused of possession or using or delivery; never once when it wasn't true. Never."

J.W. continued without interruption:

> I have 20 law officers in my congregation. And, you know, Mark Wilson wore Badge 2 for years, my best friend. And I don't—I just have to say that I'm really going to have a hard time because I know the evidence is going to be both sides, and I'm going to be bent toward hearing the State. And that's fine, I'll do it, but I'm just telling you.
> . . . Everyone that ever got off of a drug charge was right back out and doing it, and they never learned. And I don't know what the answer is because I'm not sure putting people in jail over drug charges, at least doing—you know, actually using the drugs, but when you're delivering it or making it or selling it is a different program.

The prosecutor reminded the jurors that they would have nothing to do with the punishment, to which J.W. replied: "I don't even know the law. I don't know what would happen; but one thing I've witnessed is an awful lot of guilty people that get off."

A.H. weighed in again, opining that "the legal ramifications" of a drug conviction are "sometimes more troublesome than the actual symptoms of some drugs that people do."

J.W. gave the counterpoint:

> Excuse me. But the other side of that is kids who are being given stuff and influenced with stuff, good kids from good families that get ruined by people who pedal this for their profit. That's an issue, and that's why I think the law has to be stiff on this thing.

After the prosecutor had a brief discussion with other potential jurors on the burden of proof, J.W. again chimed in concerning his view of "beyond a reasonable doubt." He said: "Reasonable. Reasonable doubt. Not absolute, certain, totally positive, convinced 100 million percent, because nobody would ever be found guilty. Because unless I was there and saw him, I couldn't find him guilty in this case."

After the court sent the potential jurors out to a lunch break, defense counsel made the following motion for a new jury panel:

> Judge, [J.W.] said a lot of things that were very harmful, I think, for this jury panel. He talked about his experience as a pastor, how he has a 5,000-person congregation, how he deals with—that there's at least 20 officers in his congregation, that never, not once, ever did anybody dealing with drugs have been not guilty of whatever their charge was. I think, Judge, that [J.W.] went on for quite a while in that area without being stopped at all, and I think that he has damaged this jury panel and prejudiced them against my client. I think that his position in the community, being a pastor of over 5,000 people with 20 officers, he comes from a position of authority and knowing.

Defense counsel described the taint inflicted by the pastor's comments:

> He gave all these examples about the different types of people that he's pastored over, especially he talked about some boy that committed one theft after another, how he keeps getting off. And what was the quote that he used? He used spinning their way out constantly. And I think that this panel now is of the impression that my client is here to spin his way out of a guilty plea and a guilty verdict.

Defense counsel described the prejudice to Ary and requested a new set of potential jurors as a remedy.

> I think that where [J.W.] bordered on, where he went was dangerous for my client with regards to every single person that sat and listened to this man talk about his experience as a pastor of

over 5,000 people. And I'm asking that this panel be disqualified in its entirety at this point and that we get a new panel.

The prosecutor resisted the motion arguing "there's no evidence that this panel has been tainted in any way whatsoever or that they're going to listen to [J.W.] about how he feels about something." The prosecutor contended if the defense did not like [J.W.], "they can exercise a peremptory strike just like any other juror. Clearly, [A.H.] does not agree with [J.W.]. We had some back and forth between the jurors in that regard." But the prosecution insisted the jury-selection process had been "perfectly appropriate" and there was no basis for discharging the potential jurors exposed to J.W. or otherwise declaring "any sort of mistrial in that regard."

The court denied the defense motion, ruling as follows: "[W]hile [J.W.] has made a number of comments, I don't believe those comments at this point have tainted this jury to the point that it requires a mistrial."

After returning from the lunch break, the court reconvened with the attorneys to address the defense motion to strike potential juror J.W. for cause. The court said defense counsel

> must have been reading my mind over the noon hour because I had some concerns with regard to [J.W.]'s comments. While I denied the motion for mistrial, I am concerned that what he might say this afternoon that that may go beyond where he is today in his comments and may taint the jury pool with comments later this afternoon.

After the court conducted individual voir dire with J.W., it granted the defense motion to strike for him from the panel for cause.[2]

---

[2] The court also granted the State's for-cause challenge to potential juror A.H.

The court also spoke individually to panel member J.K. to see if her conversation with J.W. while waiting for the group voir dire to begin affected her ability to be a fair and impartial juror. She told the court it did not. The court did not perform individual voir dire with any of the other potential jurors concerning the impact of J.W.'s comments, and our record does not show that the court issued any admonition to the jurors concerning the statements of their fellow panel members.

After hearing two days of testimony, the jury found Ary guilty on all three delivery counts. Ary filed a motion for new trial, alleging J.W.'s comments tainted the entire jury pool and, therefore, he did not receive "a fair and impartial trial." The district court denied the motion for new trial, stating it did not believe the other jurors were prejudiced by J.W.'s comments. The court then sentenced Ary to serve three consecutive indeterminate sentences of twenty-one years, as enhanced, for a total of sixty-three years in prison.[3]

In his appeal, Ary raises issues concerning discovery depositions and jury selection. Because we find the jury selection issue dispositive, we do not address his other claims.

II. **Scope and Standards of Review**

---

[3] This sentence was to be served consecutively to a sentence imposed in another criminal matter. Ary was sentenced to five years in prison for that offense, bringing the total prison term to sixty-eight years.

Ary focuses his appeal on the denial of his motion for mistrial[4] based on expert-like comments offered by a potential juror during voir dire. The district court generally has broad discretion in the selection of juries, and reversal would only be required if that discretion were manifestly abused. *State v. Tubbs*, 690 N.W.2d 911, 915 (Iowa 2005) (noting "control of jury *voir dire* is lodged in the sound discretion of the trial court").

But the right to a fair trial by impartial jurors has its underpinnings in our state and federal constitutions. *See Irvin v. Dowd*, 366 U.S. 717, 721 (1961); *State v. Wedebrand*, 602 N.W.2d 186, 188 (Iowa Ct. App. 1999). Accordingly, in cases of jury exposure to pretrial publicity, we engage in a hybrid standard of review, evaluating the record de novo for the purpose of determining whether the district court abused its discretion in denying the requested change of venue. *See State v. Cuevas*, 288 N.W.2d 525, 527 (Iowa 1980). We find the instant claim to be analogous; Ary claims the jury pool was tainted by exposure to inflammatory comments from a potential juror. In this situation, we will independently review the evidence with an eye to whether the district court abused its discretion in deciding the defendant failed to demonstrate a

---

[4] We question whether the defense request can be accurately called a motion for mistrial. During voir dire, defense counsel asked that the jury panel "be disqualified in its entirety at this point and that we get a new panel." *But see* Iowa R. Crim. P. 2.18(3) (contemplating challenges to jury panel "founded only on a material departure from the statutory requirements for drawing or returning the jury"). The State and district court both referred to the defense request as a motion for mistrial, and Ary has adopted that nomenclature on appeal. We note a trial does not begin until the jury has been impaneled and sworn. Iowa R. Crim. P. 2.19(1)(a). A mistrial is defined as a trial that the judge brings to an end without a determination on the merits because of a procedural error or serious misconduct or where a jury cannot agree on a verdict. Black's Law Dictionary 1154 (10th ed. 2014). But because our appellate courts have previously discussed motions lodged during voir dire as motions for mistrial, we also will do so in this opinion.

reasonable likelihood he would not receive a fair trial with the potential jurors who heard J.W.'s remarks.[5]  *Cf. Lloyd v. Iowa Dist. Ct.*, 201 N.W.2d 720, 722 (Iowa 1972) (discussing standard for change of venue).

### III.    Analysis of Jury Selection

Like all criminal defendants, Ary was entitled to a fair trial by an impartial jury.  U.S. Const. amends. VI, XIV; Iowa Const.  art. 1, §§ 9, 10; *Webster*, ___ N.W.2d at ___, 2015 WL 3814823, at *7; *see also Reynolds v. United States*, 98 U.S. 145, 154 (1878).  Prospective jurors are presumed to be impartial.  *Irvin*, 366 U.S. at 723.  The burden is on Ary to overcome that presumption.  *Cf. State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985) (examining juror exposure to pretrial publicity).

Ary contends he did not receive a fair trial because the district court denied his request to replace the entire jury panel after the panel was exposed to J.W.'s "pontificating" about his professional experiences with drug offenders and other law breakers.  Ary compares his case to *Mach v. Stewart*, 137 F.3d 630, 631 (9th Cir. 1998), where the appellate court granted a new trial because the jury pool was tainted by "expert-like statements" from a fellow venire member.  Ary contends the pastor's "long dissertation" on the culpability of drug possessors did irreparable damage to Ary's chances for a fair trial with the remaining jurors.

The State argues that ordinarily, disqualification of an individual juror for expressing opinions indicating bias during jury selection does not constitute a sufficient ground to challenge the entire panel.  *See State v. Staker*, 220 N.W.2d

---

[5] Both Ary and the State advocate for a de novo standard of review on appeal.

613, 616 (Iowa 1974). In *Staker*, a venireman asked the prosecutor if there was any truth to the rumor that the defendant's license was suspended at the time of the drunk-driving accident at issue. *Id.* at 615. The district court stopped voir dire and immediately admonished the jury panel that the license was not suspended, the license was not an essential element of the crime charged, and the jury would be given instructions on the charge. *Id.* The supreme court determined the juror's question was not so prejudicial as to infect the entire panel and deprive the defendant of a fair trial. *Id.* at 617. The court reached a similar conclusion in *State v. Dalgliesh*, 223 N.W.2d 627, 628 (Iowa 1974), finding insufficient grounds to challenge the entire jury panel based on a prospective juror's isolated remark that she would be partial because she had heard of the defendant through her daughter.

The instant circumstances are a far cry from *Staker* and *Dalgliesh*. Here, J.W.'s remarks were lengthy, uninterrupted, highly inflammatory, and presented as a product of his professional experience as the long-time pastor of a large congregation in the local community. From his initial remarks, J.W. set himself up as an expert on dealing with people who are "selling drugs" and other felons who somehow have "spun" their way out of going to jail.

Our courts give counsel latitude in their inquiries during voir dire so they may obtain information to assist in deciding how to exercise challenges. *See State v. Windsor*, 316 N.W.2d 684, 686 (Iowa 1982). We do not suggest the prosecutor could have anticipated that his initial voir dire questions would prompt J.W.'s discourse against those accused of dealing drugs. But the primary

purpose of voir dire in criminal cases is to assure the accused "his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981). In this vein, both the prosecutor and defense counsel may ask questions to eliminate bias, but not to condition prospective jurors to be receptive to the questioner's position. "Voir dire is not designed for educating jurors on the law or for persuading them on the merits of the case." *See Windsor*, 316 N.W.2d at 687. The voir dire process is to ensure a fair and impartial jury, not a favorable one. *Press-Enter. Co. v. Super. Ct. of California,* 464 U.S. 501, 511 (1984).

The voir dire in Ary's case did not achieve that primary purpose. Once J.W. introduced himself as a pastor and expansively shared his opinion that if someone is arrested for a drug crime they are likely to be guilty, the prosecutor had a duty to protect the integrity of the jury pool. *See State v. Tolson*, 82 N.W.2d 105, 106 (Iowa 1957) (discussing prosecuting attorney's duty to "see that the accused has a fair trial"). But instead the prosecutor returned at least three more times to solicit J.W.'s views on judging witness credibility. At one point the prosecutor told J.W. he need not apologize for expressing his belief in the preordained guilt of those accused of drug-related crimes. Before the defense motion to disqualify the jury panel, neither the prosecutor nor the court took measures to curtail the pastor's comments or to advise the jury panel that his statements were not to be considered when deciding whether Ary was guilty or not guilty.

Given these circumstances, Ary's comparison to *Mach* is apt. In that case, Mach was charged in Arizona state court with sexually assaulting a young girl. *Mach*, 137 F.3d at 631. During voir dire, the judge elicited from a prospective juror that she had a certain amount of expertise regarding child sexual assault because she had taken child psychology courses, worked with psychologists and psychiatrists, and interacted with children while employed as a state social worker for at least three years. *Id.* at 632-33. The prospective juror made four separate statements that she had never been involved in a case where a child who accused an adult of sexual abuse was lying. *Id.* at 633. The Ninth Circuit reasoned the juror's statements were expert-like because of "the nature of [the] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times they were repeated." *Id.* The Ninth Circuit found the statements were "highly inflammatory and directly connected to Mach's guilt." *Id.* at 634; *see also Paschal v. United States*, 306 F.2d 398, 399-400 (5th Cir. 1962) (finding prospective juror's comment that his bank had received some the defendant's counterfeit money inevitably influenced the minds of the other jurors because the comment was directed at the defendant's guilt and based on special information or knowledge).

Just as the juror in *Mach* held herself out as being an expert in child sexual assault, 137 F.3d at 632–33, J.W. portrayed himself as well-versed in dealing with drug offenders, their efforts to "spin" a story, and that they were inevitably guilty as charged. As authority for his expertise, J.W. cited his forty-plus years of pastoral experience and his position as head of a five-thousand

person congregation and a staff of ten pastors. His declaration of his credentials parallels the citation of the *Mach* juror to her education and work experience.

The State contends J.W.'s comments were not directly connected to Ary's guilt because the pastor spoke generically about drug offenders and not specifically about Ary's dealing or witnesses involved in the case at hand. J.W. repeatedly said he had never pastored a person who was falsely accused of being involved with drugs, just as the juror in *Mach* repeatedly said she had never known a child to falsely accuse an adult of sexual assault. *See id.* at 633. J.W.'s statements were directly connected to Ary's guilt because the pastor asserted that, in his experience, if the police accuse someone of being involved with drugs, that person is guilty. *See id.* at 634 (holding juror's comments were directly connected to Mach's guilt because juror asserted, "in her experience . . . children never lied about sexual assault").

The State acknowledges statements offered by potential jurors may rise to the level that the entire pool is infected, but asserts *Mach* would only apply in the rare case where a potential juror expresses "special information, expertise, or a highly inflammatory opinion." The State contends Ary's jury selection is not that rare case because J.W. was merely a "talkative" individual and his responses were based on his personal, not professional experience. The State argues J.W. was expressing a personal opinion and not speaking as an expert, because at one point during voir dire he stated, "if it's involving drugs, I'd probably think the person is guilty and that's only because of my personal experience."

We are not persuaded that J.W.'s reference to his "personal experience" clarified for his fellow panel members that he was not speaking as an experienced professional. J.W. also said: "I'm prejudiced because I have never pastored a person that was accused of any type of drug possession, usage or delivery or selling that I didn't know that they were guilty." J.W. reiterated this sentiment later by saying, "I've never known a case where someone was falsely accused of possession or using or delivery; never once when it wasn't true. Never." J.W. made a point of referencing his lengthy professional tenure and his position of authority to give credibility to his statements. The comments' generality does not dilute their prejudicial nature. *See Mach*, 137 F.3d at 634.

The State also contends J.W.'s comments were not like expert testimony because he did not have the specialized knowledge that comes from education like the *Mach* juror did. *See* 137 F.3d at 623-33. We are not persuaded by the distinction. Special knowledge can be gained through means other than education. In fact, our courts recognize a witness can be qualified as an expert based on the witness's "knowledge, skill, experience, training, or education." Iowa R. Evid. 5.702. The criteria for qualifying as an expert under this rule "are too broad to allow distinctions based on whether or not a proposed expert belongs to a particular profession or has a particular degree." *Hutchinson v. Am. Family Mut. Ins. Co.*, 514 N.W.2d 882, 887-88 (Iowa 1994). Moreover, members of the clergy are held to similar standards as other members of the counseling profession, regardless of if they are licensed as counselors. *See* Iowa Code § 709.15(1)(a) (2013); *State v. Edouard*, 854 N.W.2d 421, 432 (Iowa 2014). If

the judicial system is willing to accept expertise based on knowledge and experience outside of education, it is logical the laypeople of the venire would as well.

The State correctly points out that *Mach* is "an extreme case" and has not been applied to reverse convictions in other jurisdictions. *See, e.g., United States v. Lussier*, 423 F.3d 838, 842 (8th Cir. 2005). In *Lussier*, a prospective juror revealed he knew the only defense witness and considered him to be a "neighborhood nuisance." *Id.* at 840. The juror was cautioned against elaborating and only answered "[y]eah" when asked if he would have a problem with the witness's credibility. *Id.* The court immediately excused the juror. *Id.* When Lussier moved to strike the panel because of the juror's comment, the court inquired into the possibility of obtaining a new pool of jurors. *Id.* Upon learning a new panel would not be available for some time, the court denied Lussier's motion and, instead, offered three options to address Lussier's concern that the panel was tainted. *Id.* (the options were individual voir dire, a specific cautionary instruction to the group, or standard instructions). Lussier elected to have the court give the jury a curative instruction. *Id.* at 841. "Accordingly, the district court instructed the jury that 'nothing I have said during the course of this trial or anything that might have been said during the jury selection process is evidence in this case.'" *Id.* The Eighth Circuit concluded the juror's remark was neither expert-like nor highly inflammatory. *Id.* at 842. The court distinguished *Mach* and concluded the juror's comment was not prejudicial enough to overcome the presumption of juror impartiality. *Id.*

Like the Eighth Circuit in *Lussier*, courts from other jurisdictions have rejected challenges under *Mach* when the prospective juror's comments did not pertain to the defendant's guilt, were not expert-like or inflammatory, or were addressed by curative actions. *See, e.g.*, *United States v. Guzman*, 450 F.3d 627, 629–32 (6th Cir. 2006) (district court asked jurors who heard general comments about others' experiences with the criminal justice system if they could be impartial and all answered affirmatively); *State v. Sanders*, 750 N.E.2d 90, 103-04 (Ohio 2001) (juror only expressed personal opinions, did not speak at length, and was immediately excused for cause); *State v. Doerr*, 969 P.2d 1168, 1173-74 (Ariz. 1998) (juror's comment was brief and isolated, merely an acknowledgement of his own bias, not inflammatory, and did not pertain to the defendant's guilt or innocence).

Unlike the jurors in those cases, during voir dire J.W. confidently and repeatedly expressed his bias against those accused of drug offenses, cloaked as an expert opinion. J.W.'s comments were also troubling for an additional reason. The pastor told a story about how he had used a sting-like operation to catch a boy in his congregation suspected of stealing. As part of the operation, J.W. took note of the serial numbers on dollar bills in the pop jar and later checked them against bills in the boy's possession. According to J.W., the numbers matched. J.W.'s story inadvertently foreshadowed the State's evidence regarding the controlled buys conducted to prove Ary's drug dealing. The similarity between J.W.'s story and the State's evidence reinforces the "expert-like" status of J.W.'s statements by suggesting the pastor was credible in his

assertions that he had experience regarding how guilty people try to evade responsibility for their actions.

Despite the district court's concerns about J.W.'s comments, the record does not indicate the court inquired into the possibility of obtaining a new pool of jurors from those assembled at the courthouse that day. Our record also does not reveal that the court gave a cautionary instruction to the jury pool to address any potential prejudice. At a minimum, when Ary's counsel moved for a mistrial, the district court should have conducted individual voir dire to determine whether the panel had in fact been infected by J.W.'s expert-like statements. *See Mach*, 137 F.3d at 633. The State points out the court did question one other juror, J.K., about J.W.'s comments to her while waiting for voir dire, and she denied that they would affect her ability to be fair and impartial. While the questioning of J.K. was a step in the right direction, it was not enough to detect whether J.W.'s comments during voir dire tainted the remaining jury pool.

> Given the nature of [J.W.'s] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that [those accused of drug dealing are always guilty.] This bias violated [Ary's] right to an impartial jury.

*See Mach*, 137 F.3d at 633. Under these circumstances, it would be "an impossible burden" to require Ary or any similarly situated defendant to show actual prejudice to reverse his conviction. *Cf. State v. Mootz*, 808 N.W.2d 207, 226 (Iowa 2012) (requiring automatic reversal for erroneous refusal to remove a juror under Iowa Rule of Criminal Procedure 2.18(9)). Having determined J.W.'s comments were so inflammatory and protracted as to taint the entire jury panel,

and in the absence of adequate curative measures, we reverse the denial of Ary's motion for mistrial and remand for a new trial with an impartial jury.

**REVERSED AND REMANDED.**

Mahan, S.J., concurs; McDonald, J., dissents.

**MCDONALD, J.** (dissenting)

I respectfully dissent. Several considerations cause me to part ways with the majority. First, the district court had broad discretion in deciding the questions presented, and the defendant has not established the district court abused its discretion. Second, and related, it is presumed the impaneled jurors followed the jury instructions, faithfully discharged their civic duty, and acted impartially in the absence of evidence to the contrary, and there is no evidence to the contrary. Third, *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1998), is only persuasive authority, and it is not at all persuasive. Finally, and burying the lede, controlling cases have addressed the question presented, and the controlling cases establish the defendant is not entitled to a new trial because of juror partiality.

"This case requires us to explore a delicate area of the law. It is a bedrock component of our system of justice that an accused charged with a criminal offense receives a fair trial before an unbiased decision-maker." *State v. Webster*, ___ N.W.2d ___, ____, 2015 WL 3814823, at *7 (Iowa 2015).

> As with so many things, enforcement of th[is] norm[ ] is sometimes easier said than done. The line between permissible and impermissible is often difficult to discern. For instance, while we do not want jurors to be biased, we do want them to draw upon their common experience that may cause them to perceive evidence in a distinctive way.

*Id.* "Further, here, a jury verdict has been rendered after a lengthy trial, and we have no desire to start again for trifles. As has been often said, the accused is not entitled to a perfect trial, but only a fair trial." *Id.*

The district court is owed greater deference under the circumstances than the majority affords. On appeal, the defendant asserts a violation of his federal and state constitutional right to a fair trial. The defendant did not assert constitutional claims in the district court, and his claims are thus waived. *See Webster*, ___ N.W.2d at ____, 2015 WL 3814823, at \*6 (holding the defendant waived his constitutional claims to fair trial where the defendant failed to "cite a statute, rule, or constitutional provision"). The arguments the defendant actually presented to the district court were procedural: should the court excuse the entire panel and should the court grant a new trial based on the failure to excuse the entire panel. Both decisions are reviewed only for an abuse of discretion. *See Webster*, ___ N.W.2d at ___, 2015 WL 3814823, at \*5 ("We review a denial of a motion for a new trial based upon juror misconduct or juror bias for an abuse of discretion."); *State v. Tubbs*, 690 N.W.2d 911, 915 (Iowa 2005) (stating control of voir dire is vested in the sound discretion of the district court). An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Webster*, ___ N.W.2d at ___, 2015 WL 3814823, at \*5 (citation omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* at ___, 2015 WL 3814823, at \*5. The defendant has the burden of establishing the district court abused its discretion. *See State v. Henning*, 545 N.W.2d 322, 324–25 (Iowa 1996).

The defendant has not established the district court abused its discretion in denying his motion to disqualify the panel. There does not appear to be any

rule authorizing a motion to disqualify the panel after the panel was sworn. Iowa Rule of Criminal Procedure 2.18(3) allows only for a limited challenge to the panel before it is sworn arising out of any "material departure from the statutory requirements for drawing or returning the jury." Rule 2.18(5)(k) provides that a party may challenge an individual juror for cause where the juror "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." While that rule supports a for-cause challenge to an individual juror, it does not support a for-cause challenge to the entire panel. Even if a for-cause challenge could be made against the entire panel, there is nothing in this record establishing the jurors who heard the pastor's answers had "formed or expressed . . . an opinion as to the guilt or innocence of the defendant [that] would prevent the juror from rendering a true verdict upon the evidence." *See* Iowa R. Crim. P. 2.18(5)(k). Further, as discussed in more detail below, a motion to disqualify the panel due to the statements of a prospective juror made during voir dire appears to be prohibited by controlling authority. *See State v. Staker*, 220 N.W.2d 613, 615 (Iowa 1974). I cannot conclude the district court clearly abused its discretion in denying the defendant's motion where there is no rule authorizing the defendant's challenge to the panel, where there is no record supporting a for-cause challenge to the panel as a whole, and where the motion to disqualify the panel is prohibited by controlling authority. *See State v. Hardin*, 498 N.W.2d 677, 681 (Iowa 1993) (stating that ruling on for cause challenge is "vulnerable only upon proof that the court abused the broad discretion granted in such matters");

*State v. Jones*, 464 N.W.2d 241, 242-43 (Iowa 1990) (stating the district court has broad discretion in ruling on for cause challenges); *State v. Dickson*, 202 N.W. 225, 227 (Iowa 1925) ("A trial court necessarily must exercise a judicial discretion in questions of this character. The fact of qualification of a juror is for the trial court to decide in the first instance, and the matter must be determined, not only from the answers given, but by the demeanor of the juror and the attending circumstances. A clear abuse of discretion must be shown before an appellate court will interfere.")

The defendant has not established the district court abused its discretion in denying his motion for new trial. Iowa Rule of Criminal Procedure 2.24(2)(b)(9) provides the district court may grant a new trial when "the defendant has not received a fair and impartial trial." "[M]otions for new trial are not favored and should be closely scrutinized and sparingly granted." *State v. Weaver*, 554 N.W.2d 240, 245 (Iowa 1996). We thus "do not interfere with that discretion unless there is a clear showing of abuse." *State v. Smith*, 240 N.W.2d 693, 696 (Iowa 1976); *see also State v. Harrington*, 349 N.W.2d 758, 761 (Iowa 1984) ("We do not find an abuse of discretion . . . unless the action of the trial court is clearly unreasonable under the attendant circumstances."), *abrogated on other grounds by Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). Voir dire in this matter was extensive, lasting a complete day. After the district court removed the pastor from the panel, the attorneys conducted individualized voir dire with nine prospective jurors. The attorneys then conducted additional voir dire with the entire panel for the remainder of the afternoon. The judge ruling on the

motion for new trial was the same judge who presided over jury selection and was in the best position to assess whether the petit jurors were influenced by the pastor's remarks. *See Webster*, ___ N.W.2d at ___, 2015 WL 3814823, at *12 (deferring to the district court's determination the juror was credible). There is no evidence establishing any member of the petit jury was influenced by the pastor's remarks. I cannot conclude the district court abused its discretion in denying the motion for new trial in the absence of evidence establishing juror partiality. *See United States v. Lussier*, 423 F.3d 838, 841-42 (8th Cir. 2005) ("We defer to the discretion of the trial court, particularly in the absence of any showing of actual bias."); *State v. Kneeskern*, 210 N.W. 465, 473-74 (Iowa 1926) (affirming denial of motion for new trial raising issue of juror bias and concluding the issue "was primarily for the district court"); *State v. Becker*, 140 N.W. 201, 203 (Iowa 1913) (affirming denial of motion for new trial and concluding juror partiality issue "was primarily for the district court, and with its conclusion we are not inclined to interfere").

I also part company with the majority's conclusion these jurors necessarily were partial or biased. Juror partiality or bias may be actual or implied. Actual bias occurs when the evidence shows a juror is unable to lay aside prejudices and judge a case fairly on the merits. *See United States v. Wood*, 299 U.S. 123, 133 (1936). Implied bias arises only in limited circumstances. For example, when the relationship of a prospective juror to a case is so troublesome that the law presumes a juror would not be impartial. *See id.*; *see also McDonough*

*Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 558 (1984) (Brennan, J., concurring in judgment).

The defendant has not established actual bias or partiality. "Showing that a juror is actually biased poses difficult problems of proof. Ordinarily . . . questioning of prospective jurors in voir dire is the method to smoke out actual juror bias." *Webster*, ___ N.W.2d at ___, 2015 WL 3814823, at *11. Here, the defendant was aware the pastor's comments may have tainted the jury. The defendant's counsel conducted extensive voir dire with the jurors, including individualized voir dire with nine prospective jurors, but he did not establish actual bias or partiality. Ary's failure to establish the pastor's remarks actually caused a member of the panel selected to serve on the petit jury to be impartial defeats his claim. *See id.* at ___, 2015 WL 3814823, at *12 (holding the defendant's claim of juror partiality failed when "the door was open to further explore these issues" during voir dire and the defendant failed to demonstrate actual partiality); *State v. Johnson*, 445 N.W.2d 337, 340 (Iowa 1989) (noting that party must pursue for cause challenge of individual juror when party has adequate notice of possible prejudice toward defendant); *see also State v. Ross*, 849 A.2d 648, 679 (Conn. 2004) (rejecting claim the venire was tainted by prospective juror's comments where "defendant had the opportunity during voir dire to explore those matters" and the defendant did not establish any juror "had formed an opinion on the ultimate issue in the case"); *Young v. State*, 831 So. 2d 585, 589 (Miss. Ct. App. 2002) (stating the claim the jury panel was tainted was "meritless" where the defendant had "not been able to provide any evidence of

prejudice or that the jury failed to apprehend the cautionary instruction offered by the court").

Finding no actual bias, the majority holds bias should be presumed because of the nature of the pastor's comments. I have several reservations to extending the presumption of bias to the facts presented here. First, the majority's rule creates significant hurdles to the efficient administration of justice in future cases. Unlike the implied bias cases based on a relationship between a juror and another person, which can be definitively established, the majority's holding has no definitive limit. Jurors say the darndest things. Courts will be forced to speculate when a prospective juror has said enough to irreparably poison the minds of other prospective jurors. Performing such a task in any principled and predictable way seems nigh impossible. *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of . . . impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

Second, the majority's holding in this case will incent district courts to take defensive measures and conduct in camera voir dire to avoid the risk of contaminating the entire panel with stray remarks. This would seriously cripple the trial process and unnecessarily elongate jury service without any corresponding benefit. *See United States v. Guzman*, 450 F.3d 627, 632 (6th Cir. 2006) ("Therefore, trial courts would need to conduct the entire process in

camera to prevent the risk of complete venire contamination from innocent, extraneous remarks. . . . Entirely in camera voir dire would only lengthen the process-without any corresponding benefit."); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) (noting "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote").

Third, and more fundamentally, I reject the premise that we presume the impaneled jurors were not impartial solely because of their exposure to one juror's stray remarks during voir dire. Instead, our caselaw provides we presume the impaneled jurors were serious-minded in taking their oath, they followed the court's instruction to render a verdict on the evidence, and they discharged their civic duty with the seriousness and earnestness the occasion demanded. *See State v. Tillman*, 514 N.W.2d 105, 107 (Iowa 1994) (noting that in the context of preserved challenges for cause, the court does not presume prejudice); *Dickson*, 202 N.W. at 227 ("No prejudice is shown, and we will not presume prejudice."); *see also Guzman*, 450 F.3d at 629 ("We begin with the well-established presumption of juror impartiality."); *United States v. Maxwell*, 160 F.3d 1071, 1077 (6th Cir. 1998) ("Absent proof or documentation of prejudice, we do not assume that prejudice occurred."); *United States v. McClinton*, 135 F.3d 1178, 1188 (7th Cir. 1998) ("If we accepted the defense's argument, then we would be saying that this Court does not believe that jurors can set aside a statement they have heard or an impression they have. We believe this notion underestimates a vast number of potential jurors. The tool of voir dire has the power to ferret out jurors who cannot render a verdict based on the evidence."); *United States v.*

*Hernandez*, 84 F.3d 931, 936 (7th Cir. 1996) (finding speculation that a juror's comments may have prejudiced the jury is not enough to establish relief).

The law requires evidence of bias in other contexts, and there is no reason to deviate from that requirement here. *See, e.g., Tillman*, 514 N.W.2d at 108 (requiring proof for cause challenge was incorrectly denied and proof the challenged juror who served was biased); *State v. Neuendorf*, 509 N.W.2d 743, 747 (Iowa 1993) ("[I]n order to obtain relief under a legal theory that a juror is not impartial it must be shown that that juror actually served in the case. When that juror did not serve in the case, it must be shown that the jury that did serve was not impartial."); *State v. Aldape*, 307 N.W.2d 32, 45 (Iowa 1981) ("We will not presume prejudice from the mere publication of a newspaper article."); *see also, e.g., State v. Hernandez*, No. 99-1338, 2000 WL 1433613, at *2 (Iowa Ct. App. Sept. 27, 2000) ("We will not presume prejudice from the mere publication or broadcast of news stories. The trial court need not act on mere speculation. The defendant failed to establish that any juror read the headline. When a jury has been admonished not to expose themselves to media publicity of the trial in which they are serving as jurors, a presumption arises that they will not violate that admonition." (citations omitted)).

I also part ways with the majority due to its reliance on *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1998). It is readily distinguishable from this case. In *Mach*, the court specifically asked the prospective jurors whether anyone disagreed with the challenged juror's expert-like statements, and none expressed disagreement. *See* 137 F.3d at 633. In this case, there is no similar evidence

that any member of the panel agreed with J.W.'s statements. Second, the judge in *Mach*, having notice that the panel may have been tainted, failed to conduct any additional investigation into the potential taint. *See id.* In contrast, in this case, the district court and the attorneys conducted individual voir dire with nine jurors after J.W. was removed for cause. The district court and the attorneys then conducted a full afternoon of voir dire with the panel. Voir dire was reported. There is no evidence of bias. *See Webster*, ____ N.W.2d at ___, 2015 WL 3814823, at *12 (holding the defendant's claim of juror partiality failed when "the door was open to further explore these issues" during voir dire and the defendant failed to demonstrate actual partiality);

The majority's reliance on *Mach* is misplaced for another reason: *Mach* is an outlier. *See Wells v. Ricks*, No. 07 Civ. 6982 (CM0 (ASP), 2008 WL 506294, at *36 (S.D.N.Y. Feb. 26, 2008) ("*Mach* has never been followed, or even cited approvingly, by the Second Circuit or district courts within the Circuit. Indeed, Mach is *sui generis*."). It appears that every court that has considered *Mach* has distinguished it or rejected it outright. *See, e.g., Smith v. Miller*, No. 1:12-CV-00790-LJO-JLT, 2014 WL 6924414, at *15 (E.D. Cal. Dec. 9. 2014) (rejecting *Mach* in habeas proceeding on ground that California "does not indulge in a presumption of jury taint or prejudice arising from a prospective juror's remarks"); *Middlebrook v. Curtin*, No. 2010 WL 3222519, No. 1:07-CV-1242, at *5 (W.D. Mich. Aug. 16, 2010) (distinguishing *Mach* on ground the trial court judge investigated potential taint); *Wells*, 2008 WL 506294, at *36 (collecting cases and stating the court could not find "any case other than *Mach* supporting the

dismissal of an entire voir dire panel due to a potential juror's remarks unrelated to the defendant" and concluding "the case law holds that the disqualification of an individual juror for the expression of an opinion, or for making remarks indicating bias, does not constitute a sufficient ground for a challenge of the entire panel"); *People v. Martinez*, 74 P.3d 748, 761 (Cal. 2003) (rejecting claim of jury prejudice where manager of drug rehabilitation facility who treated approximately 500 clients made statements regarding the ability of users to plan action and users proclivity to make excuses for themselves); *State v. Nikle*, 708 N.W.2d 867, 869 (N.D. 2006) (concluding "great weight is given to a potential juror's claim that he or she will remain impartial" and holding the court did not err in refusing to reject the panel where "most if not all of the members of the jury panel were subsequently asked at some point whether they could remain fair and impartial"); *State v. Yarbrough*, 767 N.E.2d 216, 234 (Ohio 2002) ("N]othing in the record indicates that the statements at issue biased the other veniremen. Absent some such indication, we decline to speculate that hearing these opinions must somehow have irretrievably tainted the other prospective jurors."); *State v. Clark*, 283 P.3d 1116, ____ (Wash. Ct. App. Aug. 20, 2012) (distinguishing *Mach* on grounds "both sides had an opportunity to extensively question the jurors, and the defense was able to identify jurors who expressed an inability to keep an open mind").

The majority's reliance on *Mach* is misplaced for a final reason: Iowa case law requires a different outcome. The same issue presented in this case was presented in *State v. Staker*, 220 N.W.2d 613, 615 (Iowa 1974):

Although never articulated in so many words, defendant's real argument must be all members of the panel were biased and prejudiced by remarks of a prospective juror thereby making a fair and impartial trial impossible. The question presented is whether the trial court erred in denying a motion for mistrial; that motion, however, in one respect was in effect a challenge to the entire panel of jurors. This assignment will first be considered as a challenge to the entire jury panel for reasons of bias and prejudice.

The court explained that there was no authority under Iowa law to strike the entire panel due to a potential taint caused by the statements of a prospective juror:

Even though bias or prejudice is established in regard to one or more particular jurors out of the panel such is not ground for challenge to the entire array. It appears to be well settled as a general proposition of law that a challenge to the array of jurors goes only to the form and manner of making up the jury panel without regard to the objections to the individual jurors who compose it and must, therefore, be based on some ground affecting the validity of the whole panel or array of jurors. Disqualification of an individual juror in a criminal case for any cause set forth in section 779.5, The Code, is not ground for challenge to the array but should be raised by challenging for cause the prejudiced jurors individually. In support see *Government of Virgin Islands v. Williams*, 476 F.2d 771, 772 (3d Cir. 1973), citing *Frazier v. United States*, 335 U.S. 497, 510, 511, 69 S. Ct. 201, 93 L. Ed. 187; *United States v. Gordon*, 253 F.2d 177 (7th Cir. 1958); *State v. Lundgren*, 124 Minn. 162, 144 N.W. 752; *Smith v. State*, 219 Miss. 741, 69 So. 2d 837; *State v. Taylor*, (Mo. 1959), 324 S.W.2d 643, 76 A.L.R.2d 671, and the subject of the annotation, 76 A.L.R.2d 678, 679; 47 Am. Jur. 2d, Jury, section 229; 50 C.J.S. Juries § 262. Decisions of other jurisdictions recognizing this rule are to be found in the A.L.R. Blue Book Service to this annotation.

Ordinarily, disqualification of individual jurors for expressions of opinions or for making remarks during selection of the jury indicating in some manner possible prejudice or bias against the accused or the occurrence of circumstances during that procedure from which such bias or prejudice might be implied does not constitute a sufficient ground for a challenge of the entire panel. *State v. Taylor*, (Mo. 1959), 324 S.W.2d at 648.

*Staker*, 22 N.W.2d at 616. The *Staker* court held the district court did not abuse its discretion in denying the defendant's motion for mistrial where the defendant claimed the panel was tainted. *See id.* *Staker* was followed several years later in *State v. Dalgliesh*, 223 N.W.2d 627, 628 (Iowa 1974), and *State v. Sallis*, 262 N.W.2d 240, 245-46 (Iowa 1978), and remains controlling authority.

The majority attempts to distinguish *Staker* and *Dalgliesh* on the ground that the nature of the remarks in this case is more inflammatory than in those cases. The distinction is not material. While the court in both *Staker* and *Dalgliesh* discussed the issue of jury taint, both cases state that a challenge to the entire panel must be in writing and is limited only to material departure from the statutory requirements for drawing the jury. Both cases state there is no for-cause challenge to the entire panel arising out of prospective juror's remarks made during voir dire. Instead, both cases conclude that the defendant has the burden to conduct additional voir dire to establish for cause challenges to the individual jurors. This court is without authority to ignore these controlling decisions of our supreme court. I thus respectfully dissent from the majority's remand of this matter for new trial.

I address the remainder of Ary's arguments. Ary's argument that the district court should have allowed him more time to conduct discovery depositions is without merit. Ary has not established the district court abused its discretion or that he suffered prejudice. *See State v. Clark*, 814 N.W.2d 551, 563 (Iowa 2012); *State v. Grimme*, 338 N.W.2d 142, 144 (Iowa 1983). In Ary's motion for new trial, he also asserted the verdicts were contrary to the weight of

the evidence. The State concedes the district court applied the wrong standard in ruling on the motion. Accordingly, I would remand this matter to allow the district court to apply the weight-of-the-evidence standard as articulated in *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998).